# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

DEC 2 0 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

JULIA ANN RATLIFF,                 )

      Plaintiff,                   )
                      )

v.                                 )    Civil Action No. 2:06cv00005
                      )    **MEMORANDUM OPINION**

JO ANNE B. BARNHART,               )
**Commissioner of Social Security,**   )    By: GLEN M. WILLIAMS
      Defendant.                   )    SENIOR UNITED STATES DISTRICT
                      )    JUDGE

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Julia Ann Ratliff, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2006). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ratliff filed her current application for SSI on or about December 18, 2003, alleging disability as of January 1, 1998, based on back pain, nerves and a learning problem.[1] (Record, ("R."), 104-06, 204, 228.) The claim was denied initially and upon reconsideration. (R. 73-80, 97.) Ratliff then requested a hearing before an administrative law judge, ("ALJ"), on August 9, 2004. (R. at 52.) The ALJ held a hearing on October 3, 2005, at which Ratliff was represented by counsel. (R. at 409-46.)

By decision dated November 22, 2005, the ALJ denied Ratliff's claim. (R. at 13-24.) After consideration of the entire record, the ALJ found that Ratliff had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23.) The ALJ found that the medical evidence established that Ratliff had severe impairments, namely a back disorder and depressive disorder, but he found that Ratliff's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. § Part 404, Subpart P, Appendix 1. (R. at 23.)

---

[1] Ratliff filed previous applications for SSI on September 11, 2001, and August 27, 2002. (R. at 109-11, 112-14.) However, these claims were denied, and Ratliff did not pursue these claims.

Case 2:06-cv-00005-GMW-PMS   Document 17   Filed 12/20/06   Page 2 of 27   Pageid#: 70

The ALJ concluded that Ratliff's allegations regarding her limitations were not totally credible. (R. at 23.) Furthermore, the ALJ determined that Ratliff retained the residual functional capacity to perform a significant range of light work.[2] (R. at 23.) The ALJ found that Ratliff had no past relevant work experience. (R. at 23.) Based on Ratliff's age, education and work history, as well as the testimony of a vocational expert, the ALJ found that Ratliff was capable of performing a significant number of jobs existing in the national economy, such as work as a counter clerk, a parking lot attendant and a general office clerk. (R. at 23.) Thus, based on these findings, the ALJ determined that Ratliff was not under a "disability" as defined by the Act and was not eligible for SSI benefits. (R. at 23.) *See* 20 C.F.R. § 416.920(g) (2006).

After the ALJ issued his decision, Ratliff pursued her administrative appeals, (R. at 8), but the Appeals Council denied her request for review on December 29, 2005. (R. at 5-7.) Ratliff then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2006). The case is before this court on Ratliff's motion for summary judgment filed May 15, 2006, and on the Commissioner's motion for summary judgment filed July 13, 2006.

## II. Facts

Ratliff was born in 1980, (R. at 112), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). Ratliff has a high-school education, (R. at

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2006).

-3-

208, 416), and has no relevant past work history. (R. at 205, 441-42.)

At the October 2005 hearing before the ALJ, Ratliff testified that she had not worked since 1998 when she worked for two weeks as a telemarketer. (R. at 441.) Ratliff also testified that she spent most of her days sitting in a recliner with a heating pad to help alleviate her back pain. (R. at 416-17.) Ratliff, who has three children, stated that her mother was mostly responsible for taking care of her children. (R. at 415-16.) She also noted that, due to her physical limitations, she had to rely upon her parents to shop for the family. (R. at 422.) Ratliff also testified that "basically, everything" caused her pain and limited her activities. (R. at 416.) She stated that she "can't be a normal person" because she was unable to do things such as shopping, housekeeping, taking her children places and lifting and playing with her children. (R. at 416-18.) Moreover, Ratliff testified that she was only able to leave her home when she had to, such as for medical appointments. (R. at 424-25.)

In addition, Ratliff testified that she only slept approximately one to two hours per night. (R. at 425.) She also commented that her mother had to prepare her breakfast for her each morning. (R. at 426.) Ratliff testified that she had frequent crying spells and that she had days when she became angry and did not want to be around her children. (R. at 423.) Ratliff stated that the pain was to the point that "[i]f it wasn't for [her] kids, [she would have] done away with [herself]." (R. at 422.) Ratliff testified that she was willing to do anything to alleviate her back pain, including surgery. (R. at 420.) She also testified that she saw John Ludgate, Ph.D., a psychologist, to help her deal with her nerves, anger problems and crying spells. (R. at 421-23.)

-4-

At the hearing, Ratliff noted that, on her good days, she attempted to do some housecleaning, consisting of mopping, sweeping and vacuuming for about 30 minutes at a time. (R. at 426.) She testified that she worked until she began to hurt, then took a break, and began again after the pain lessens. (R. at 426.) Ratliff also stated that she only had one or two good days per week. (R. at 427.)

Marshall Tessnear, a psychological expert, also testified at Ratliff's hearing. (R. at 428-39.) Based on his review of the record and the testimony at the hearing, Tessnear diagnosed Ratliff with a major depressive disorder of moderate severity, which he opined was secondary to her pain and loss of physical abilities. (R. at 429.) Tessnear recalculated Ratliff's IQ using the Wechsler Adult Intelligence Scale Third Edition, ("WAIS-III"), which was originally calculated by B. Wayne Lanthorn, Ph.D., and gave her a performance IQ score of 69[3]. (R. at 429.) Tessnear's opinion, along with that of Lanthorn and the Disability Determination Services reviewer, was that Ratliff was functioning at a higher level than indicated by her WAIS-III scores. (R. at 430.) Tessnear noted that, based on Lanthorn's description, Ratliff was likely functioning somewhere in the borderline range, possibly even the low average range. (R. at 430.)

In reviewing Ratliff's records, Tessnear mentioned that a nonpsychiatric treatment source had noted an anxiety disorder. (R. at 430.) However, he stated that because this source did not elaborate on the disorder, he did not consider it to be a diagnosis. (R. at 430.) Tessnear also commented that the records indicated that

---

[3] Tessnear noted that Lanthorn's evaluation, which indicated that Ratliff had a performance IQ of 79, was likely a typographical error. (R. at 429.)

Ratliff had reported feelings of helplessness, hopelessness and sleep disturbance. (R. at 431.) He diagnosed Ratliff with a depressive disorder, not otherwise specified. (R. at 431.) Furthermore, Tessnear opined that Ratliff's activities of daily living did not seem to be markedly impaired by her mental conditions. (R. at 431.) Tessnear stated that Ratliff's mental issues only mildly impacted her activities of daily living and social functioning, and that her concentration, persistence and pace were mildly impaired due to purely mental difficulties. (R. at 431-32.) He found no evidence of any extended periods of decompensation or deterioration. (R. at 431-32.) In Tessnear's opinion, Ratliff's depressive disorder began impacting her level of functioning around November 2001. ( R. at 433.)

James Williams, an independent vocational expert, testified that Ratliff's past work experience was not vocationally relevant and that she had no past work experience of which he was aware. (R. at 442.) Williams was asked to consider, for the purposes of a hypothetical, an individual of Ratliff's same age, educational background and vocational history. (R. at 442.) The ALJ indicated that such a person would "retain the capacity to work from a physical standpoint as indicated in Exhibit 18F, and from a mental standpoint as indicated in Exhibit 13F."[4] (R. at 442.) Williams noted that the assessments outlined in the exhibits provided for no significant limitation from a mental standpoint, and that, from a physical standpoint, the hypothetical person could perform a limited range of light work. (R. at 442-43.)

---

[4] Exhibit 18F refers to the Residual Physical Functional Capacity Assessment performed by Dr. Donald R. Williams, M.D., a state agency physician, on June 1, 2004. (R. at 388-95.) Exhibit 13F refers to the Residual Mental Functional Capacity Assessment performed by Joseph Leizer, Ph.D., a state agency psychologist, on February 25, 2003. (R. at 357-60.)

Williams testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a counter clerk with a sit-stand option, a parking lot attendant and a general office clerk. (R. at 443.) He was then asked to assume, as fully credible, the testimony Ratliff gave regarding the degree, frequency and duration of her pain. (R. at 443-44.) He also was asked to consider Ratliff's allegations that she only had two to three good days out of a week, that she suffered from functional limitations that prohibited her from being able to easily move around without difficulty and her ability to maintain attention, concentration, persistence and pace. (R. at 443-44.) Accepting her testimony as credible, Williams agreed with the ALJ that these restrictions would prevent her from doing not only the work that Williams identified, but all other work. (R. at 444.)

In rendering his decision, the ALJ reviewed records from Buchanan County Rural Family Practice Clinic; Buchanan General Hospital; Johnston Memorial Hospital; Pikeville Methodist Hospital; Clinch Valley Medical Center; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; R. J. Milan Jr., Ph.D., a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; Howard Leizer, Ph.D., a state agency psychologist; Dr. H. J. Patel, M.D.; Dr. Muhammad R. Javed, M.D.; John Ludgate, Ph.D.; and Marshall D. Tessnear, Ph.D., a psychologist. Ratliff's attorney submitted additional medical evidence from Pikeville Methodist Hospital to the Appeals Council.[5]

---

[5] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-7), this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-7-

Ratliff sought treatment from Buchanan Rural Family Practice between the period of September 2001 to June 2004. (R. at 256-80.) Ratliff was diagnosed with chronic back pain, anxiety, depression, gastroesophageal reflux disease, ("GERD"), and obesity. (R. at 256-80.) Ratliff was prescribed Soma, Lortab, Xanax, Zantac and Ultracet. (R. at 256-80.) In addition, Ratliff was advised to lose weight and exercise. (R. at 256-80.) An x-ray of the lumbar spine performed on September 10, 2001, showed no bony or disc space abnormality, vertebral bodies revealed normal alignment with each other, pedicles were intact and there were no demonstrable abnormalities of the lumbar spine. (R. at 290.) Shortly thereafter, on October 11, 2001, Ratliff complained that her lower back pain was radiating into her legs. Ratliff underwent an MRI of the lumbar spine on October 29, 2001, which indicated that the intervertebral disc spaces were normally maintained throughout the lumbar region with normal signal intensity and that there was no evidence of a herniated disc. (R. at 276, 291.)

On November 6, 2001, Ratliff saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, at the request of the Virginia Department of Rehabilitative Services for a psychological examination to assist in the consideration of her claim. (R. at 292-97.) Ratliff reported back pain, migraine headaches and nerve problems. (R. at 292.) The WAIS-III was administered to Ratliff, who achieved a verbal IQ score of 75, a performance IQ score of 79 and a full-scale IQ score of 70, placing her in the borderline range of intellectual functioning. (R. at 292, 295-96.) According to Lanthorn, Ratliff's motivation during the administration of the WAIS-III was lackadaisical. (R. at 295.) Lanthorn opined that she could function at a higher level than the scores indicated. (R. at 295.)

-8-

Lanthorn noted that Ratliff reported back pain in the lumbar region of her back, but was unable to identify a distinct accident or injury that would account for the pain or discomfort. (R. at 294.) Ratliff also complained of being nervous around others. (R. at 294.) She denied having any depression and stated that she had never sought mental health treatment. (R. at 294.) She also reported that she provided the majority of the care for her children, who were two years old and three months old at the time of the evaluation. (R. at 295.) Ratliff commented that while she attempted to do chores such as cooking and housekeeping, she relied upon her family members to shop for her. (R. at 295.) Lanthorn reported that, with regard to the WAIS-III test, Ratliff scored in the extremely low range in the areas of psychomotor speed, manual dexterity, pattern completion and spatial reasoning. (R. at 296.)

Lanthorn diagnosed Ratliff with borderline intellectual functioning and personality disorder, not otherwise specified, with dependent, passive-aggressive and avoidant features. (R. at 296-97.) Ratliff was given a Global Assessment of Functioning, ("GAF"), score of 70.[6] (R. at 297.) Ratliff also was found to have the ability to manage her own funds. (R. at 297.) Lanthorn rated Ratliff's memory functions as intact and commensurate with her other cognitive abilities, and found that, at worst, Ratliff had mild limitations in her overall adaptability skills. (R. at 297.)

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STASTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61-70 indicates that the individual has "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Dr. Frank M. Johnson, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment on February 26, 2002. (R. at 298-305.) Dr. Johnson noted that x-rays of Ratliff's lumbar spine were normal, an MRI was normal and her deep tendon reflexes were normal. (R. at 299-300.) Dr. Johnson found that Ratliff retained the capacity to occasionally lift and carry items weighing up to 20 pounds, frequently lift and carry items weighing up to 25 pounds, stand and/or walk with normal breaks for a total of six hours in an eight-hour workday and to sit for a total of about six hours in an eight-hour workday. (R. at 299.) He found that Ratliff had an unlimited ability to push and/or pull. (R. at 299.) Dr. Johnson imposed no manipulative, visual, communicative or environmental limitations. (R. at 301-03.)

Dr. Johnson noted that Ratliff claimed that she provided most of the care for her two children, cleaned house, cooked and cared for her personal needs generally without assistance. (R. at 304.) Thus, Dr. Johnson found that Ratliff's allegation of disability was not fully credible and that she should be able to perform a wide range of light work activities. (R. at 304.) A medical consultant[7] reviewed Dr. Johnson's findings. (R. at 325-26.) While the medical consultant mostly agreed with Dr. Johnson's findings, the consultant disagreed with the findings regarding Ratliff's exertional limitations. (R. at 325.)

R. J. Milan, Jr., Ph.D., a state agency psychologist, assessed Ratliff's mental residual functional capacity in February 2002. (R. at 306-08.) Ratliff was found to be moderately limited in her abilities to understand, remember and carry out detailed instructions, to interact appropriately with the public, to accept instructions and

[7] The signature of the medical consultant is not legible. (R. at 326.)

respond appropriately to criticism from supervisors and to set realistic goals or make plans independently of others. (R. at 306-07.) Milan noted no other limitations. (R. at 306-08.) He found that Ratliff's mental allegations were partially credible and that she was able to understand, remember, and carry out at least simple work instructions under ordinary supervision, with no significant limitations in concentration, persistence and pace. (R. at 308.) Milan found that Ratliff had some difficulty working closely around others or working with the public, and he opined that she may respond tensely to critical feedback from supervisors. (R. at 308.) Milan commented that, other than these minor limitations, Ratliff was capable of adapting "self-sufficiently in a work setting, sustaining activities on a regular, continuing basis." (R. at 308.)

Dr. Donald R. Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on February 24, 2003. (R. at 343-50.) Dr. Williams found that Ratliff retained the functional capacity to occasionally lift items weighing up to 50 pounds, to frequently lift items weighing up to 25 pounds, to stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and to sit for a total of approximately six hours in an eight-hour workday. (R. at 344.) He found that Ratliff retained an unlimited ability to push and/or pull. (R. at 344.) Dr. Williams imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 345-57.) Dr. Williams also noted that Ratliff could not sit/stand for extended periods and was unable to bend because of the pain in her upper/lower back and legs. (R. at 348.) Lastly, he found Ratliff's subjective allegations to be partially credible. (R. at 348.)

-11-

Ratliff sought treatment from Dr. H. J. Patel, M.D., from February 2003 to October 2003. (R. at 351-56.) During these visits, Ratliff complained of back pain. (R. at 351-56.) A physical examination on February 24, 2003, indicated lumbar lordosis, paraspinal muscle spasm tenderness and pain in the back of the hamstring and back muscles. (R. at 356.) Dr. Patel diagnosed Ratliff with chronic refractory low back pain, lumbar loradosis and morbid obesity. (R. at 356.) Ratliff was advised to lose weight, to exercise and to begin a diet. (R. at 356.) She was instructed to begin abdominal and back muscle stretching exercises. (R. at 356.) On April 9, 2003, Dr. Patel again noted that Ratliff was suffering from chronic refractory low back pain, lumbar lordosis and morbid obseity, and also diagnosed Ratliff with lumbar facet syndrome. (R. at 355.) He prescribed Flexeril, Lortab, Soma, Vioxx and Trazadone. (R. at 355.) Ratliff was advised to apply warm compresses to her back and she was also referred for physical therapy. (R. at 355.) Ratliff again was instructed in exercises and advised to continue the exercises at home. (R. at 355.)

An MRI of the lumbar spine in November 2003 showed some desiccation of the lower two discs associated with slight encroachment on the ventral canal, but with the disc heights well-maintained. (R. at 361.) The MRI also revealed a small central bulge with annular tear at the L4-L5 level, and a small central subligamentous herniated nucleus pulposus, ("HNP"), at the L5-S1 level. (R. at 361.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on February 25, 2003. (R. at 328-42.) Leizer concluded that Ratliff suffered from an affective disorder, an anxiety-related disorder and mental retardation. (R. at 328.) He opined that a residual functional capacity

-12-

assessment was necessary. (R. at 328.) Leizer found that Ratliff had no restrictions on her activities of daily living, experienced no difficulties maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 338.) Leizer found that Ratliff's subjective allegations were not fully credible. (R. at 342.) He concluded that she would be limited to the performance of simple, unskilled work. (R. at 342.)

In May 2004, Ratliff was referred to Dr. Muhammad R. Javed, M.D., for evaluation of her musculoskeletal system. (R. at 381-87.) Dr. Javed performed the examination on a consultative basis at the request of the Commissioner. Dr. Javed noted that Ratliff walked without using any assisting device. (R. at 381.) He also observed that no leg edema or calf tenderness was present. (R. at 382.) Dr. Javed found tenderness in the lumbosacral spine area, with flexion of the lumbar spine possible to 45 degrees. (R. at 382.) He concluded that Ratliff had spondylolysis at the L5 level of the spine with grade one spondylolysis at the L5-S1 level, which most likely caused her low back pain. (R. at 382.) Dr. Javed concluded Ratliff's low back pain was genuine and that she had some limitations in her movements. (R. at 382.)

Dr. Javed also completed a Physical Assessment Of Ability To Do Work-Related Activities. (R. at 383-85.) He concluded that Ratliff could lift and carry items weighing up to 20 pounds occasionally and could lift items weighing up to 10 to 15 pounds frequently. (R. at 383.) Dr. Javed found that she could stand or walk for a total of four hours in an eight-hour workday, but could do so for only one hour without interruption. (R. at 383.) He also determined that Ratliff could sit for a total of six

-13-

hours in an eight-hour workday, but could do so for only one to one and one-half hours at a time. (R. at 385.) Dr. Javed concluded that Ratliff could occasionally climb, stoop and balance, but never kneel, crouch or crawl. (R. at 384.) He found that Ratliff should avoid exposure to extreme temperatures, noise, humidity and vibration. (R. at 385.) Dr. Javed opined that Ratliff would be absent from work approximately two days per month. (R. at 385.) He also noted that Ratliff had a limited range of motion of the dorsolumbar spine. (R. at 386.)

Following Dr. Javed's exam, state agency physician Dr. Williams completed a Physical Residual Functional Capacity Assessment on June 1, 2004. (R. at 388-95.) Dr. Williams found that Ratliff could perform light work diminished by a limited ability to push and/or pull with the lower extremities. (R. at 389.) He further found that Ratliff could frequently balance, kneel and climb, but could only occasionally stoop, crouch and crawl. (R. at 391.) Dr. Williams imposed no manipulative, visual, communicative or environmental limitations. (R. at 391-93.) Dr. Williams opined that although Ratliff had some movement limitations and genuine back pain, based upon the vocational factors, she nonetheless retained the capacity for light work with no restrictions on walking and standing. (R. at 395.) Dr. Williams's findings were affirmed by Dr. Johnson, another state agency physician, on July 26, 2004. (R. at 395.)

On April 20, 2004, Howard Leizer, Ph.D, a state agency psychologist, completed a PRTF, finding that Ratliff suffered from an affective disorder, an anxiety-related disorder and mental retardation. (R. at 362-79.) Leizer noted that a residual functional capacity assessment was necessary. (R. at 362.) Leizer found that Ratliff

-14-

was only mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 362.) Leizer found Ratliff's subjective allegations only partly credible. (R. at 379.) Lastly, he found that Ratliff was capable of performing unskilled work. (R. at 379.) Leizer's findings were affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on July 26, 2004. (R. at 362.)

Ratliff saw John Ludgate, Ph.D., a psychologist, on May 25, 2005. (R. at 404-06.) At that time, Ratliff reported that she was experiencing stress due to a divorce. (R. at 404.) She further stated that she was nervous and anxious around people. (R. at 404.) Ratliff remarked that she had suffered from depression for the previous five years. (R. at 404.) She also stated that she had never received mental health treatment. (R. at 404.) Ludgate reported that Ratliff was fully oriented with a depressed and anxious mood. (R. at 406.) Ludgate also observed that Ratliff had feelings of worry, sadness and hopelessness. (R. at 406.) He further noted that her affect was good and that she had experienced no hallucinations or psychosis. (R. at 406.) Ludgate noted that while Ratliff's memory and concentration were impaired, her insight, judgment and behavior were good. (R. at 406.) Ludgate diagnosed Ratliff with a major depressive disorder recurrent and moderate, and also a then-current GAF score of 65. (R. at 406.) On June 22, 2005, Ratliff reported that she was doing "no better" than she was during the initial visit. (R. at 403.) Ludgate observed that Ratliff was fully oriented with a depressed mood and affect. (R. at 403.) He deemed her insight and judgment as good, but her concentration as impaired. (R. at 403.) Ludgate reiterated a diagnosis of major depressive disorder recurrent and moderate. (R. at

-15-

403.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 22, 2005, the ALJ denied Ratliff's claim. (R. at

-16-

13-24.) After a consideration of the entire record, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23.) The ALJ found that the medical evidence established that Ratliff had severe impairments, namely a back disorder and a depressive disorder, but he found that Ratliff's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ also found that Ratliff's allegations regarding her limitations were not totally credible. (R. at 23.) Furthermore, the ALJ determined that Ratliff retained the residual functional capacity to perform a significant range of light work. (R. at 23.) The ALJ found that Ratliff had no past relevant work experience. (R. at 23.) Based upon Ratliff's age, education and work history, as well as the testimony of a vocational expert, the ALJ found that Ratliff was capable of performing a significant number of jobs in the national economy, such as work as a counter clerk, a parking lot attendant and a general office clerk. (R. at 23.) Thus, based on these findings, the ALJ determined that Ratliff was not under a "disability" as defined by the Act and was not eligible for SSI benefits. (R. at 23-24.) *See* 20 C.F.R. § 416.920 (g) (2006).

Ratliff argues that the ALJ erred in failing to properly weigh the opinion of Dr. Javed, an examining physician, and in finding that Ratliff was able to perform light work. (Memorandum in Support of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief"), at 12-16.) In addition, Ratliff argues that the ALJ erred in failing to include any mental limitations in the hypothetical that was posed to the vocational expert at the hearing. (Plaintiff's Brief at 17-19.) Lastly, Ratliff argues that the ALJ erred in determining that Ratliff was capable of performing alternative work. (Plaintiff's Brief at 17-19.)

-17-

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Ratliff's first argument is that the ALJ erred in failing to give weight to the opinion of Dr. Javed, an examining physician, and in finding that Ratliff was able to perform light work. (Plaintiff's Brief at 12-16.) In essence, Ratliff contends that the ALJ misinterpreted Dr. Javed's opinion and failed to assign it any weight. Ratliff argues that the ALJ relied solely upon a residual functional capacity assessment

-18-

performed by Dr. Donald R. Williams, a nonexamining state agency physician, which was inconsistent with the opinion of Dr. Javed.

Dr. Williams and Dr. Javed agreed that Ratliff was capable of lifting items weighing up to at least 20 pounds occasionally and items weighing up to 10 pounds frequently. (R. at 344, 383.) Likewise, they both found that Ratliff would be able to sit for six hours in a typical eight-hour workday. (R. at 344, 383.) However, while Dr. Williams found that Ratliff was capable of standing or walking for six hours in an eight-hour workday, Dr. Javed opined that Ratliff was limited to standing or walking for only four hours in an eight-hour workday. (R. at 344, 384.) Dr. Williams found that Ratliff could perform light work, diminished by a limited ability to push and/or pull with her lower extremities. (R. at 389.) Dr. Williams also noted that Ratliff was able to frequently balance, kneel and climb, but could only occasionally stoop, crouch and crawl. (R. at 391.) Conversely, Dr. Javed concluded that Ratliff could only occasionally climb, stoop and balance, and that she could never kneel, crouch or crawl. (R. at 384.) In addition, Dr. Javed stated that, due to Ratliff's condition, she would be absent from work approximately two days per month. (R. at 385.)

Ratliff argues that the restrictions and limitations noted by Dr. Javed are clearly more severe than those imposed by Dr. Williams. Specifically, Ratliff claims that because of these more strict limitations, Dr. Javed essentially found that Ratliff was not capable of performing *any* light work. Ratliff asserts that light work requires an individual to be able to stand or walk for six hours in an eight-hour day. *See* SSR 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Ratliff maintains that the ALJ apparently misunderstood Dr. Javed's assessment, and

that, based upon the ALJ's opinion and findings, he must have determined that the two assessments were consistent. Thus, Ratliff argues that the ALJ did not assign any weight to Dr. Javed's "real" opinion, i.e., that the claimant cannot perform light work.

Based upon a review of the record, it is obvious that the ALJ took the opinions of both Dr. Williams and Dr. Javed into consideration. In the ALJ's opinion, he clearly referenced and summarized the evaluations and examinations conducted by each doctor. (R. at 13-24.) The ALJ precisely reported the findings of each doctor with respect to how long Ratliff would be able to stand or walk in an eight-hour day. (R. at 13-24.) While Ratliff argues that the ALJ failed to give weight to Dr. Javed's opinion, Ratliff herself fails to recognize that, based upon the evaluations of *both* Dr. Javed and Dr. Williams, Ratliff was deemed able to sit for a period of six hours in an eight-hour workday. At the hearing, the vocational expert identified three specific jobs that he determined Ratliff was able to perform. Of the jobs mentioned, the vocational expert specifically referred to the job of a counter clerk, where there is a sit-stand option. Therefore, in this particular job, Ratliff would be permitted to sit when she was experiencing back pain. Since both experts opined that Ratliff was capable of sitting for six hours in an eight-hour workday, it is clear that there are jobs within the national economy that she was able to perform.

In rendering his decision, the ALJ referenced each treating and examining physician. He clearly summarized each examination or evaluation by stating any diagnoses or findings reported. Based on this review of the record, the ALJ concurred with Dr. Williams's opinion and found that Ratliff had the capacity to carry out light level work. It also should be noted that Dr. Williams's opinion was affirmed by Dr.

-20-

Johnson. Therefore, there is substantial evidence within the record to support the ALJ's findings as to the weighing of this evidence.

Ratliff also argues that the ALJ erred in failing to include mental limitations in the hypothetical that was posed to the vocational expert, as well as in finding that Ratliff was able to perform alternative work. (Plaintiff's Brief at 17-19.) Since Ratliff was found to have no past relevant work, the burden shifted to the ALJ to demonstrate that Ratliff was able to perform alternative work. *See* 20 C.F.R. § 416.920(g) (2006). At the hearing, the vocational expert was asked to consider a hypothetical where there was "an individual of the same age, educational background, and vocational history as [Ratliff]." (R. at 442.) In addition, the expert was to assume that the hypothetical individual had the capacity to perform work from a mental and physical standpoint as indicated in the assessments of Dr. Williams and psychologist Leizer. (R. at 442.) Leizer performed the Mental Residual Functional Capacity Assessment and determined that Ratliff was only moderately limited in her ability to understand, remember and carry out detailed instructions and her ability to maintain attention and concentration for extended periods. (R. at 357.) More importantly, Leizer found that Ratliff was not significantly limited in the remaining areas of the Mental Residual Functional Capacity Assessment. (R. at 357.)

Thus, based upon a review of Leizer's findings, the vocational expert noted that there was no significant limitation present that would keep the individual from working. (R. at 442.) Furthermore, the vocational expert reported that, based upon the functional capacities described, one would be able to perform light work, including alternative jobs such as a counter clerk, a parking lot attendant and a general office

clerk. (R. at 443.) Thus, he was able to identify alternative work that someone with Ratliff's limitations was capable of performing.

Following the hearing, the ALJ found that Ratliff's back disorder and depressive disorder were "severe," but he found that Ratliff did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) However, the ALJ also found that "these medically determinable impairments [did] not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (R. at 23.) Because the ALJ found the impairments were severe, Ratliff argues that the ALJ failed to properly set out the facts in the hypothetical that was posed to the vocational expert. The hypothetical that was posed included the consideration of Exhibit 13F, a Mental Residual Functional Capacity Assessment of Ratliff, which found that Ratliff suffered from no significant mental limitations. It should be clarified that Ratliff is essentially arguing that the ALJ posed a hypothetical that was in direct conflict with his own findings. However, the ALJ's findings regarding Ratliff's impairments, and the severity thereof, were not made until *after* the hearing.

Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). In order to determine whether a hypothetical question fairly sets out all of a claimant's impairments, the court must evaluate (1) whether the ALJ's findings as to the claimant's residual functional capacity is supported by substantial evidence; and

Case 2:06-cv-00005-GMW-PMS   Document 17   Filed 12/20/06   Page 22 of 27   Pageid#: 90

(2) whether or not the hypothetical adequately set forth the residual functional capacity as found by the ALJ.

Here, the ALJ offered a hypothetical that referenced the Physical Residual Functional Capacity Assessment performed by Dr. Williams, as well as the Mental Residual Functional Capacity Assessment performed by psychologist Leizer. Each assessment found that Ratliff was capable of performing light work. In addition to the mental assessment performed by Leizer, other mental or psychiatric evaluations were conducted. In particular, at the hearing, Marshall Tessnear, a psychological expert, testified that based upon his review of the record, Ratliff's activities of daily living did not seem to be markedly impaired by her mental condition. (R. at 431.) Tessnear testified further that her mental impairments only mildly impacted her activities of daily living and social functioning, and that her concentration, persistence and pace were only mildly impaired due to the mental problems. (R. at 431.)

Similarly, other professionals who evaluated Ratliff opined that, at worst, she had mild limitations in her overall adaptability skills. (R. at 297.) A state agency psychologist determined that while Ratliff did suffer from minor limitations that moderately limited her abilities to understand and remember detailed instructions, to carry out those instructions, to interact appropriately with the public, to accept instructions, to respond appropriately to criticism and to set realistic goals and to make independent plans, Ratliff, nonetheless, remained capable of functioning properly in a work setting and sustaining those activities on a regular basis. (R. at 308.) Furthermore, Howard Leizer, another state agency psychologist, found that Ratliff was only mildly restricted in her activities of daily living and social functioning. (R. at

Case 2:06-cv-00005-GMW-PMS   Document 17   Filed 12/20/06   Page 23 of 27   Pageid#: 91

372.) He also reported that Ratliff experienced moderate difficulties in maintaining concentration, persistence or pace. (R. at 372.) He determined that Ratliff was capable of performing unskilled work. (R. at 379.)

During the hearing, the ALJ properly posed a hypothetical representing the medical evidence provided in the record. (R. at 442.) Each expert who testified, made an assessment or conducted an evaluation, noted that Ratliff was not significantly impaired from a mental standpoint. Nevertheless, in the ALJ's finding, he gave Ratliff the benefit of the doubt and determined that her back and depressive disorders were severe. (R. at 23.) However, as noted earlier, even though the ALJ found that the impairments were severe, he also found that the impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. at 23.)

It is clear that, based upon the evidence relied upon by the vocational expert, a "reasoning mind would accept [the evidence] as sufficient to support [the ALJ's findings]." *See Laws*, 368 F.2d at 642. Thus, this court is of the opinion that the findings as to Ratliff's residual functional capacity are supported by substantial evidence. Moreover, the ALJ presented a hypothetical that accurately set forth his finding with regards to Ratliff's residual functional capacity.

It also should be noted that, based on the record, Ratliff's main mental impairments seemed to be related to anxiety and depression. Both anxiety and depression are generally considered to be treatable illnesses. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *See Gross v.*

-24-

*Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Morever, the record in this case indicates that Ratliff has not sought continuous mental treatment to control her depression and anxiety. In fact, in one evaluation Ratliff actually denied having any problems with depression. (R. at 294.)

It is the province of the ALJ to assess the credibility of a witness or a claimant. *See Hays*, 907 F.2d at 1456. As the Fourth Circuit has stated, "[b]ecause [the ALJ] had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ found that Ratliff's allegations regarding her limitations were "not totally credible." (R. at 23.) At the hearing, Ratliff testified that her mother prepared meals for her and cleaned the house. (R. at 426.) She also stated that her mother took care of the children for her and that her mother was basically raising the children. (R. at 415-16.) In addition, Ratliff testified that she could attempt to do household chores and help her children with their homework only on her good days. (R. at 426.) However, in a psychological evaluation conducted by Lanthorn, Ratliff reported that she provided "the lion's share" of the care for her children. (R. at 295.) She also noted that she cleaned the house and sometimes cooked. (R. at 295.) Likewise, on two Daily Activities Questionnaires from Virginia Disability Determination Services, Ratliff stated that she took care of her children, had a driver's license, cooked and cleaned on a limited basis, did household chores such as sweeping, vacuuming and mopping and left the home once a week to visit friends and family. (R. at 169-75, 218-24.)

-25-

In addition, several of the doctors who either examined or evaluated Ratliff also questioned her credibility, explaining that her allegations were either "partially credible," "only partly credible" or "not fully credible." (R. at 304, 308, 342, 348, 379, 390.) Furthermore, Lanthorn opined that Ratliff exhibited a poor effort during the IQ testing and that she actually functioned at a higher level than the scores indicated. (R. at 295.)

Thus, based upon the evidence discussed above, it is obvious that the ALJ was justified in finding that Ratliff's allegations were not totally credible. This court will not disturb the ALJ's findings regarding credibility, unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). Here, the ALJ's determination regarding Ratliff's credibility is plainly supported by substantial evidence and, in turn, gives weight to the ALJ's decision to deny Ratliff's claim.

## V. Conclusion

For these reasons discussed above, I will sustain the Commissioner's motion for summary judgment and decision to deny benefits, and I will overrule Ratliff's motion for summary judgment.

An appropriate order will be entered.

DATED: This 20th day of December, 2006.

Case 2:06-cv-00005-GMW-PMS    Document 17    Filed 12/20/06    Page 26 of 27    Pageid#: 94

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE